

Douglass Kinniry
My Rights Lawyers

1601 Tilton Road, Suite 6    Northfield, NJ 08225
609-788-3595 (Tel)    609-788-3599 (Fax)
dk@myrightslawyers.com    www.myrightslawyers.com

**CONFIDENTIAL FOR SETTLEMENT PURPOSES ONLY**

May 12, 2014

**<u>Via Email and Regular U.S. Mail</u>**
Daniel V. Johns, Esq.
Ballard Spahr, LLP
1735 Market Street
Philadelphia, PA 19103
johns@ballardspahr.com

**RE:    Janet White v. The University of Pennsylvania**
       **1: 13-cv-07219-RBK-KMW**

Dear Mr. Johns,

As you are aware, our office represents Plaintiff Janet White in her Complaint against her current employer, the University of Pennsylvania. Kindly accept this correspondence offered for the purpose of settlement and resolution of all claims in lieu of formal litigation. Fed. R. Evid. 408 applies herein. Although some additional background information is provided, Plaintiff relies, as well, on the Statement of Facts set forth in her Complaint.

Kindly review and, if there is interest in settlement by Defendant, please provide a response that might move us closer to a resolution of this case. We thank you in advance for your anticipated time and effort to potentially resolve this matter.

Unfortunately, Bipolar II Disorder, and mental health conditions in general, remain largely misunderstood. This is especially true in the employment context. Many sufferers like Plaintiff have been discriminated against in the workplace. Plaintiff has chosen not only to assert her own legal rights, but to help further eliminate the stigma associated with mental illness. As counsel, we are committed to advancing this very important issue on her behalf.

**Background and Plaintiff's Claims Under the Family Medical Leave Act**

Plaintiff has been employed by the University of Pennsylvania for over nineteen (19) years. Since 2012 she has held the position of Coordinator C/Program Manager at Penn's Graduate School of Education (GSE), Education Policy Division. Throughout her years of employment, Plaintiff consistently received positive performance evaluations, including her first year at GSE. In fact, after one (1) year at GSE she received a promotion and was also nominated for the Outstanding Service to Students Award.

Plaintiff has been diagnosed with Bipolar II Disorder. Plaintiff has successfully managed this condition for many years and for the most part, she has been successful in both professional and personal efforts. However, in or around 2012/2013, Plaintiff's health began to decline. She was unable to sleep, had difficulty concentrating, and began experiencing mood swings and depression. As Plaintiff's depression deepened, her doctor recommended that she take a medical leave of absence from work.

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

Beginning in May 2013, Plaintiff took eight (8) weeks of medical leave pursuant to the Family Medical Leave Act during which time she worked hard to get well. However, nearly from the moment she returned to work on July 1, 2013, the retaliatory conduct began. She received an email from her boss, Defendant Richard Ingersoll: "I don't mean to pry, but am wondering if you would be comfortable filling me in at all on what your medical condition is? I am concerned both for you and the Division here."

Shortly thereafter, Plaintiff received a letter from the Business Administrator stating that her merit salary increase for that year would be only 1%, whereas the year prior it had been 3%.

Several weeks later, Ingersoll presented Plaintiff with her yearly performance evaluation. (**Exhibit A**) The evaluation was critical of Plaintiff for the time she spent on medical leave, stating that her absence had caused problems for the division. He wrote:

b.) This past year Janet was absent about a half dozen days per semester.  In addition, with 2 weeks notice, Janet took a 2 month medical leave of absence for May and June.

Of course, absences from work are normal, beneficial, legitimate, allowable, and well within any employee's rights.

But Coordinator absences can also impact Divisional business and functioning.  Because the Divisional workload seemed too much for a single staff coordinator, beginning last fall EP hired a half-time Assistant Coordinator.  While legitimate, Coordinator absences, of course, exacerbate these workload difficulties.  This was the case at the end of the academic year.

On or about August 7, 2013, Plaintiff received a second evaluation from Chief Financial Officer of Penn's Graduate School of Education, Defendant Jason Presley. (**Exhibit B**) The review was harsh and inaccurate. Among other criticisms, he stated that Plaintiff was "slow" and not "mentally present." He also told her verbally that her comments during the program manager meetings do not "make sense."

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

The performance evaluation came as a shock to Plaintiff, as Defendant Presley had not met with her once during the year to inform her of his concerns. University policy provides that a "supervisor must meet with staff members to discuss the unsatisfactory performance."

Plaintiff was also disturbingly surprised because she had never before received a negative performance evaluation. In fact, her evaluation from the previous year reflected the second highest performance ranking: "Staff member's performance consistently meets and frequently exceeds all established goals/expectations for the position."

After being presented with the performance evaluation, Presley told Plaintiff that her position was being discontinued and that she would be demoted to an administrative assistant position with decreased responsibility, authority and status. Presley further explained that the division would be hiring a new program manager to manage a new internship program. While Presley insisted that Plaintiff's new position would be a lateral move, Associate Ombudsman, Marcia Martinez-Helfman, whom Plaintiff consulted with after receiving the negative performance evaluations, confirmed that it would be a demotion.

Plaintiff was present for more than one meeting in which the internship program, which is anticipated to begin next year, was discussed. There have also been several emails explicitly discussing the details of the program and the role of program manager. For example, on October 16, 2013, Defendant Ingersoll drafted a proposal which Plaintiff was asked to email "for Ed Policy to set up a preliminary [internship] program to begin in Fall 2014…staffed by new lecturer/manager and 1 tenured faculty member…" (**Exhibit C**) Defendant Ingersoll also sent an email on May 8, 2014 indicating that Education

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

Policy "is reorganizing our MS degree program, including creating an internship program."

On December 2, 2103, in response to the negative performance evaluations, the impending demotion, workplace harassment and other retaliatory conduct in response to Plaintiff's medical leave, Plaintiff filed a lawsuit asserting claims pursuant Family Medical Leave Act, 29 U.S.C. 2601 *et seq*. As a Penn alumna and long-time employee who once loved her job, this was not an easy decision for Plaintiff. But after years of dedicated service, Plaintiff knew the way she was being treated was not only wrong, but illegal. She could not remain silent.

Plaintiff owed it to herself, as well as other individuals suffering with her condition, to take this critical and potentially life-altering step. She knew it would be a difficult road—and it has been. Since filing the lawsuit, the retaliation, harassment and discrimination have only intensified, in further violation of the FMLA, as well as the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.,* and the Pennsylvania Human Relations Act, 43 P.S. 951 *et seq*.

### Since Plaintiff Filed Her FMLA Claim: Retaliation Through Hostility!

In response to filing a lawsuit, Plaintiff has experienced further retaliation in the form of a hostile work environment. Defendant Ingersoll, despite being Plaintiff's immediate supervisor, has refused to speak to her, choosing to communicate exclusively via email. Plaintiff has been overloaded with work even though Defendants are aware that her Bipolar II disorder is aggravated by stress and anxiety. Plaintiff has been denied an administrative assistant despite the fact that Plaintiff's job description specifically

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

states that she is to have such an aide and the fact that other similarly situated employees are provided with same. (An administrative assistant was requested as part of the Education Policy 2014 budget.) Plaintiff has continuously been belittled, verbally harassed and made to feel incompetent.

What's more, Defendants' most recent actions have prevented Plaintiff from fulfilling her job functions. For example, she has been left out of the loop regarding the planned internship program and internship opportunities in general, despite needing this information in order to inform prospective students and encourage enrollment yield. She was not provided with the Education Policy's 2015 budget even after requesting it, even though Plaintiff helped prepared the document and needs the information contained therein to do her job. In fact, Plaintiff was un-invited from attending a recent budget meeting though historically Plaintiff would have attended same. In short, Plaintiff has been set up to fail.

Plaintiff made these concerns known to Dr. Andy Porter, Dean of the Graduate School of Education, in an email dated April 2, 2014. (**Exhibit D**) Plaintiff's letter to Dean Porter went unacknowledged. After receiving no response, Plaintiff contacted the Provost of the University, Vincent Price, to express similar concerns. (**Exhibit E**) Again, Plaintiff's correspondence went unanswered save for an acknowledgement of receipt.

If Ingersoll has such a difficult time communicating with Plaintiff, a key employee, he should leave; or there should be a suitable work position made available for Plaintiff where she may productively work free from the intense negativity generated for no good reason other than a resentment towards her for exercising her rights under the law.

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

## **Plaintiff Has Been Further Retaliated Against for Speaking to the *Daily Pennsylvanian***

The University of Pennsylvania has had at least four (4) student deaths over the past year believed to be related to mental health. These sad events triggered a University-wide discussion over the adequacy of mental health services at Penn, with many expressing criticism that the University failed to do all it could to assist students in need of treatment. (One of these students had been enrolled in the Graduate School of Education. GSE Assistant Dean for Academic and Student Afffairs, Lois Macnamara, convened a meeting with Plaintiff and the other program managers after the death to discuss how to best manage students in crisis. However, the focus of the meeting was avoiding liability and indeed the student suicide was not mentioned.)

Plaintiff felt compelled to speak out, to express solidarity with others struggling with their mental health, and to show that the University was failing not just its students, but also its employees. In response to a series dedicated to mental health at Penn, Plaintiff composed a letter to the editor of the *Daily Pennsylvanian*, the independent, student-run newspaper at Penn. (**Exhibit F**)

Based on this letter and conversations with Plaintiff's counsel, the *Daily Pennsylvanian* ran a February 17, 2014 article entitled "Penn employee sues over alleged retaliation for medical leave." Plaintiff received words of support from several of her colleagues. However, from Defendants she was further retaliated against in the form of more work and more criticism.

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

Despite the increased retaliation, Plaintiff is not afraid to further publicize Defendants' treatment of her, and will indeed continue to speak out until this matter is resolved and she is made whole. Over the past year Penn has already suffered significant harm to its reputation. While the University has publicly claimed to be taking steps to address mental health concerns on campus, Plaintiff's story calls into question the genuineness of these efforts.

**Plaintiff's Potential Claims Under the Americans with Disabilities Act and the Pennsylvania Human Relations Act**

Defendants were made aware of Plaintiff's Bipolar II condition when she first took FMLA leave. In filing this lawsuit, Plaintiff has chosen to make her disability, as well as its symptoms, public. Yet, Defendants have responded with increased retaliation and harassment. Such conduct is not only outrageous, but it constitutes disability discrimination and failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.,* and the Pennsylvania Human Relations Act, 43 P.S. 951 *et seq*.

As detailed above, Defendants have created a hostile work environment. Further, they have taken no steps to determine whether Plaintiff's disability necessitates a reasonable accommodation.

Under the law, an employer is required to take some initiative to determine the appropriate accommodation for a disabled employee. See e.g. Taylor v. Phoenixville, 184 F.3d 296 (1999). The process is interactive because employers will often not know what kind of work the employee can do, and the employee will often be unaware of the range of available employment opportunities. Id. at 311. The interactive process requires the

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

employer to make a "good faith" effort to seek accommodations. Id. at 312. In relying on the EEOC's Interpretative Guidance, the Third Circuit offered some basic steps an employer should take to demonstrate a good faith effort: Meet with the employee who requests an accommodation; Request information about the condition and what limitations the employee has; Ask the employee what he or she specifically wants; Show some sign of having considered the request; Offer and discuss available alternatives when the request is too burdensome. Id. at 317. Defendants took none of these steps.

Defendants exhibited zero tolerance or empathy for Plaintiff and indeed, for mental health conditions overall. The University's track record for properly managing and understanding mental health is abominable. What did Defendants do when they learned of Plaintiff's disability? They knocked her to the ground, ensuring that her struggle with this precarious condition worsened rather than improved. This is an employer which holds itself out to be one of the most prestigious and progressive universities in the world! Yet, its retrograde approach to mental health is unbefitting such a highly acclaimed academic institution.

Plaintiff is currently performing both managerial and administrative job duties, essentially doing the work of two (2) people. This often requires Plaintiff to work late hours far in excess of what she is being compensated for. Plaintiff has made several requests for an administrative assistant, explaining that as one person, she is simply unable to complete all assigned tasks within the deadlines provided. (Again, as Plaintiff's workload has increased since she returned from leave, she believes that this is increase in further retaliation for taking FMLA leave.) Other employees in similar positions as

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

Plaintiff are afforded an aide. In fact, Plaintiff's job description provides: "Another responsibility is coordination and supervision of an administrative assistant." (Exhibit G)

Defendants flatly denied Plaintiff's requests. At no point did Defendants express willingness to even engage in a discussion with Plaintiff regarding her concerns about completing all assignments. Why would an employer refuse to engage in a discussion with its employee about how that employee could better succeed? Instead, Plaintiff has been met with criticism over her inability to do same.

Whether Plaintiff identified the reason for her request is of little consequence. Defendants were aware of Plaintiff's disability and its accompanying symptoms yet made no good faith effort to determine whether any type of accommodation was necessary to allow Plaintiff to perform the essential duties of her job.

### Settlement Demand

#### *Non-Monetary Relief Sought*

Plaintiff has always taken pride in her work. She is a young woman and has no plans to retire any time soon. She would like to move on to a new position outside of the University of Pennsylvania, but is worried that her fractured relationship with her current employer will impact her ability to find new employment. Accordingly, Penn should provide her with a ***positive employment reference***. In addition, regardless of whether a future employer would be able to access these records, Penn must ***remove the negative 2013 performance evaluations authored by Defendants Ingersoll and Presley*** from Plaintiff's personnel file. (*Please note that the University Ombudsman advised Plaintiff that these performance evaluations could "follow" Plaintiff to future non-Penn jobs.)*

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.  It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

***Severance Package***

Pursuant to Penn's Pay Continuation Benefit, an employee whose position is discontinued is entitled to four (4) weeks of continued pay. Employees who have worked for the University for more than two (2) years are entitled to an additional week of pay for every year worked. Plaintiff has been an employee of Penn for 19 years. On or about August 7, 2013, when it was communicated to Plaintiff that her position was being eliminated and replaced, Plaintiff was not offered this severance package, which would have amounted to 23 weeks of pay. Penn routinely offers such packages to employees, yet failed to do so for Plaintiff. (Instead, she was told that she would be demoted.)

Plaintiff would have accepted the 23 weeks; not now. Penn must increase this amount to 71 weeks' severance plus all fringe benefits in order to resolve this claim. Since July 1, 2013, when she returned from medical leave through the present, Plaintiff has been retaliated against, first for taking the FMLA leave, and then for filing this lawsuit. In short, Defendants Ingersoll and Presley have harassed, bullied and discriminated against Plaintiff on a near daily basis. Every day is a struggle for Plaintiff to simply do her work and maintain her dignity. Plaintiff will never be able to recover this lost time. Accordingly, Plaintiff seeks, the 23 weeks she was originally entitled to, plus an additional  44 weeks representing the time she was forced to remain in a hostile work environment (July 1, 2013 through May 9, 2014) and an additional four (4) weeks transition and adjustment time.

Plaintiff demands **71 weeks** of severance inclusive of all current fringe benefits.

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

*Other Monetary Damages; Non-Compensatory Damages; and Attorneys' Fees and Costs*

Just prior to taking leave, Plaintiff began seeing a new therapist,     Cory        F. Newman, Ph.D. of Penn Behavioral Health. Plaintiff sought Dr. Newman's treatment as a temporary addition to her regular mental health providers. Plaintiff anticipated that she would only need Dr. Newman's treatment to better enable her to return to work after her FMLA leave. However, due to Defendant's harassment and retaliatory conduct, Plaintiff has found it necessary to continue treatment with Dr. Newman, at a cost of $20 (co-pay) per visit. (**Exhibit H**) This continued treatment would not have been necessary had it not been for Defendant's illegal actions. Accordingly, Plaintiff seeks **$880**, representative of 44 additional weeks of treatment.

Lastly, Plaintiff must be compensated for non-compensatory and emotional distress damages in the amount of **$200,000**, as well as attorneys' fees and costs which total, to date, approximately **$68,000.**


*Summary*

Plaintiff took an approved medical leave in order to overcome suicidal depression. Recurring depressive episodes dominate the lives of people with Bipolar II. Depressive episodes can last from a few months to a few years, and if sufferers are not adequately treated, more than half their lives can be spent in severe episodes of depression. The lifetime suicide rate is 19%, and serious medical problems are much more common in Bipolar illness, for example, experiencing twice the death rate from heart attack compared with people who do not have mood disorders. In addition, there is the issue of

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.  It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

"kindling," which refers to the fact that the more mood episodes a person has, the harder they are to treat as time goes on. (See e.g. http://www.sharecare.com/health/bipolar-disorder)

Plaintiff was literally trying to save her own life, and she worked very hard to do so. But when she returned to work, the stress of the retaliation and harassment, which has been ongoing for the last ten (10) months, threatened to reverse all the important work Plaintiff did to get well. Though it takes all her strength, Plaintiff returns to work every day and tries to be productive within the circumstances of a hostile work environment.

Again, our total demand at this time to resolve this lawsuit is as follows: ***$268,880*** in attorneys' fees and costs, out-of-pocket medical expenses and non-compensatory damages; ***71 weeks of severance*** inclusive of Plaintiff's current benefits packages; the ***removal of the two (2) negative performance evaluations*** from Plaintiff's personnel file; and a ***positive employment reference*** from the University of Pennsylvania.

We provide to you this demand in advance of the May 20, 2014 Settlement Conference so that you may have an opportunity to review, discuss and formulate a position in response. Thank you for your time and consideration. If you have any questions or concerns, please do not hesitate to contact me.


Very truly yours,


*/s/ Michelle J. Douglass*
Michelle J. Douglass, Esquire


MJD/sk
CC:   Janet White (via email)

This document is privileged, confidential, and/or exempt from disclosure under applicable law including but not limited to the attorney-client and work-product privilege. This document is not to be used for any purpose other than to place you on notice of the substance of this correspondence.   It is not to be used for any purpose contrary to New Jersey Evidence Rule 408

Exhibit A

*Ingersoll evaluation*

**Comments**
**Performance and Staff Development Plan for Janet White**

As EP Division Coordinator, Janet's job duties include organizing the admissions applications review process, managing the rostering and listing of EP courses, updating EP documents, assisting students, assisting faculty, coordinating EP academic and social events and functions, creating the annual budget, etc.

*Strengths:*

Janet is well motivated and hard-working, has been willing to spend extra time if needed on Divisional matters, is appreciated by students, liked by faculty in general, and has worked well with me, as EP Chair.

*Challenges:*

a.) In midyear, a faculty member, and her two Post-Doctoral students, filed a complaint regarding Janet concerning her timeliness, efficiency, and closure on particular tasks. The complaint centered on Janet's response to their requests in regard to three task areas: use of the new online *Canvas* academic course software program, use of the new online *Concur TEM* travel planning, booking and reimbursement software program, and updating course bulk packs. In response, the faculty member, Janet and I met in March to try to facilitate communication and understanding surrounding the complaints. We all agreed to put in place a process that hopefully would work to see that tasks are provided with agreed-upon and reasonable deadlines and completed within those deadlines.

b.) This past year Janet was absent about a half dozen days per semester. In addition, with 2 weeks notice, Janet took a 2 month medical leave of absence for May and June.

Of course, absences from work are normal, beneficial, legitimate, allowable, and well within any employee's rights.

But Coordinator absences can also impact Divisional business and functioning. Because the Divisional workload seemed too much for a single staff coordinator, beginning last fall EP hired a half-time Assistant Coordinator. While legitimate, Coordinator absences, of course, exacerbate these workload difficulties. This was the case at the end of the academic year.

Janet White

Graduate School of Education - Education Policy Division

July 29, 2013

**Performance and Staff Development Plan**

**Staff Member's Comments**

I agree with Prof. Ingersoll's comments that I am motivated and hard-working. I am dedicated to our students and do all possible to assist them in the completion of their program.

I was promoted from Education Policy Division Administrative Assistant to Coordinator one year ago. Unlike other managers/coordinators within the usual GSE organizational structure, however, I had no administrative assistance. I worked long hours to try to keep up with the workload, but it was considerable, and some tasks occasionally got behind schedule (re: Laura Desimone and Jade Caines' complaint). We were finally allowed to bring in a part-time temp assistant in late October 2012, which was helpful with tasks that did not require use of any GSE/University systems.

I was absent several days per semester due to the illness that prompted my medical leave. The leave was deemed medically necessary by my doctor and was administered through all the proper University channels. I worked closely with our temp assistant to get him prepared to fill in during my absence in May and June, a period following graduation, which is typically much slower than the regular academic year. He and I met with our chair, the admissions and financial aid officers, CFO, IT director, etc. before my leave to ensure that all processes were in place so that divisional operations would continue running smoothly during my absence, and he was given access to admissions and reimbursement systems. I checked in periodically during my leave to make sure that things were well, and my understanding was that all was in order. I take my job seriously, I took my leave seriously, and I do all I can to carry out my duties responsibly and effectively.

# Exhibit B

**Performance and Staff Development Plan – Short Form**
**(For All Staff)**

β

**Name of Staff Member: Janet White, Program Manager**

**Date of Appraisal: May 2013**         **Appraisal Period: Academic Year 2012-2013**

**Dept. Name:   Ed Policy Division, GSE**

**Appraiser Name and Title: Jason Presley, CFO**

**Summary of Performance: (Check the One Category That Best Describes the Staff Member's Overall Performance)**

___ Staff member's performance consistently exceeds established goals/expectations for the position and is clearly outstanding overall.

___ Staff member's performance consistently meets and frequently exceeds all established goals/ expectations for the position.

___ Staff member's performance consistently meets established goals/expectations for the position.

_X_ Staff member's performance meets some, but not all, established goals/expectations for the position and improvement in specific areas is required.

___ Staff member's performance is unacceptable for the position and significant improvement is required.

**Other comments:**

In agreement with Ingersoll's comments, but disagree with the review. I rate Janet's performance at the level of meeting "some but not all of the requirments of the position". In my direct experience with her, I concur that slowness is an issue. Janet is slow during meetings, slow to understand policies and procedures, slow in adadpting to new technologies, and this is consistent with complaints from faculty about timliness about requests. I can also note times in our weekly program managers meeting in which, at a minimum, it appears that Janet is not mentally present or is not paying attention—including times when she sits with her eyes closed. I would like to see improvement on timlieness and on focus.

**Goals to be achieved during the next appraisal cycle:** (List 3 – 5 competencies to be developed and/or demonstrated during the coming cycle.)

- Improving timeliness of response to faculty and staff
- Pay attention and be more of a participant during program manager meetings
- Work more closely with Admissions to ensure the program meets its admissions targets.

**Signatures: Secure the appropriate signatures.**
*Staff Member Signature & Date_____ *Janet White* _____
*My signature indicates that the Performance Letter has been reviewed with me and I have received a copy. It does not necessarily indicate my concurrence with the Performance Letter.

Supervisor Signature & Date_____

Administrative Signature & Date_____

**Sr. Business Officer Signature & Date_____

***Signature of Senior Business Officer is required if staff member is in any level of the following job titles: Financial Coordinator, Grants Coordinator, Business Administrator, Business Manager, Grants Manager and Manager of Administration and Finance.*

*Staff Member's Comments (Optional): The staff member may submit written comments on any aspect of the performance appraisal process. When completed, the comments should be given to the supervisor. The document will be forwarded to Human Resources/Staff and Labor Relations and will become a part of the staff member's official personnel file. If the staff member wishes to provide comments, s/he should check the following box.  [ ]*

# Exhibit C



One of Dan's suggestions was to have an "internship" course, which is consistent with what you are suggesting.

**From:** Rebecca Maynard
**Sent:** Thursday, October 17, 2013 7:59 AM
**To:** LAURA MARIE DESIMONE; Janet White; Richard Ingersoll; Jonathan Supovitz; John Fantuzzo; Matthew Steinberg
**Subject:** RE: Internship program - Follow-up meeting

Sorry I missed the meeting. Another thought is that the course Matt is piloting this spring has many of the elements of an internship and might also be a good substitute for a masters paper. One thought is to provide Matt with some support to oversee some aspects of the research students in his class will be doing.

A drawback to the independent study as opposed to a "course" is that nobody formally gets credit for the teaching. It might be better to have students register for an internship and then, with 7 or more students, it would naturally count in faculty courseload.

Becak

**From:** LAURA MARIE DESIMONE
**Sent:** Wednesday, October 16, 2013 12:54 PM
**To:** Janet White; Richard Ingersoll; Jonathan Supovitz; Rebecca Maynard; John Fantuzzo; Matthew Steinberg
**Subject:** RE: Internship program - Follow-up meeting

This email is from me and Richard – he drafted the proposal, which I think will be a great start for our discussion!

**From:** Janet White [mailto:jawhite@gse.upenn.edu]
**Sent:** Wednesday, October 16, 2013 12:12 PM
**To:** LAURA MARIE DESIMONE; Richard Ingersoll; Jonathan Supovitz; Rebecca Maynard; John Fantuzzo; Matthew Steinberg
**Subject:** Internship program - Follow-up meeting

Dear Ed Policy Faculty,

We had a good meeting with Dan Wagner and Ameena about the internship program, though we missed Jon and Rebecca. We agreed that we wanted a follow-up meeting to discuss a preliminary proposal such as the one below. If you can complete the poll by this Friday, hopefully we can find a time in the next couple of weeks to meet. Thanks.

Proposal for EP to set up a Preliminary program to begin in fall 2014 with the following components:

- optional for students and depends on placements available.
- an alternative to a MS thesis
- credit bearing as an I-Study (EDUC 999)
- entails an end-of-intern report
- length and semester is TBD by students and by placement org


over



- paid or unpaid, depending on placement org
- travel stipend of $1500 provided to intern if placement is out of town
- staffed by new Lecturer/Manager and at least 1 tenured faculty member, who gets a 1 course buyout
- involves a Memo Of Understanding between EP and placement org

Laura


The link to the Doodle scheduling poll is:

http://doodle.com/g4exgv3fv8tduxxt2n5e44bp/private

Exhibit D

## Janet White

| | |
|---|---|
| **From:** | Janet White <jawhite@gse.upenn.edu> |
| **Sent:** | Wednesday, April 02, 2014 11:13 AM |
| **To:** | 'ANDREW PORTER' |
| **Subject:** | Concerns |

Dear Andy,

I've spoken with our Director of Admissions Natalie Herring to express my concerns that our students and prospective students are being ill-served, and enrollment yield is being affected as a result of the poor treatment I'm receiving at GSE.

I'm completely dedicated to serving our students and to increasing our enrollment yield, but my ability to do this is seriously impeded due to the following:

* I've never been allowed administrative assistance, which is very necessary for efficient divisional functioning, despite the fact that my job description calls for it, that it was requested in the Ed Policy FY14 budget, and that all other similarly situated GSE employees have such assistance.

* I've been left out of the loop regarding a planned internship program that's been discussed for months, and internship opportunities in general, despite the fact that I need this information in order to inform our prospective students and encourage enrollment yield.

* I've not been provided with the Ed Policy FY15 final budget after requesting it, despite the fact that I helped prepare it and need it to perform my job. In fact, I was "un-invited" from attending the recent budget meeting that took place with you, Richard Ingersoll, Jason Presley and Greg Tausz.

* Our division chair Richard Ingersoll has been refusing to talk to me for months, despite the fact that we need to meet regularly to review divisional matters; I'm only communicated with via email.

It's always been my objective to perform my job well, to assist our students and prospective students as best as possible, but my ability to do so is being impeded by actions such as these being initiated/allowed by GSE leadership. I think this can only be viewed as increased retaliation for filing the lawsuit and speaking to the Daily Pennsylvanian.

It is my job to manage the Ed Policy division, serve our students, encourage enrollment, and I want to be allowed and enabled to perform my job to the best of my ability.

Sincerely,
Janet

Janet White
Coordinator
Education Policy Division
Graduate School of Education
University of Pennsylvania
3700 Walnut Street
Philadelphia, PA 19104-6216
215-898-0597 (office)
215-898-4399 (fax)
jawhite@gse.upenn.edu

# Exhibit E



Susan Kinniry <susankinniry@gmail.com>

## Concerns

1 message

**Janet White** <jawhite@gse.upenn.edu>                                                   Thu, May 1, 2014 at 12:18 PM
To: provost@upenn.edu

Dear Provost Price,

I write to bring your attention to some matters of concern at the Graduate School of Education.

I am employed as a Coordinator/Program Manager in the Education Policy Division at the Graduate School of Education. I am also the plaintiff in a lawsuit against Penn and Ed Policy Chair Richard Ingersoll and GSE CFO Jason Presley for violations of the Family Medical Leave Act. The basis of my case is that I took an approved eight-week medical leave to attend to a serious health issue in May-June 2013 and returned to learn that my position was being discontinued and I was being pushed into a demoted position. Upon my return I also received performance evaluations that violated both federal law and Penn HR policies. There was no recourse to address these within the University system, so legal action ensued and has been ongoing for months. During this time I have experienced daily hostility in my workplace and have been the subject of increasing retaliation.

But the reason I write you is even beyond that. It is to express my concerns about being prevented from doing my job properly, and about the general abuses of the GSE management team.

I've worked at Penn for 19 years and have always been committed to providing excellent service to our students. Despite the poor treatment I receive in my workplace, I come into work every day and am professional, pleasant and productive. I wouldn't have it any other way. However, I'm being disallowed by the GSE management team from doing my job to the best of my ability, for reasons expressed in a recent letter to Dean Andy Porter (attached). These reasons include the lack of necessary administrative assistance, important programmatic information being withheld from me, my supervisor, our division Chair, not speaking to me, etc. Dean Porter never responded to my letter nor addressed my concerns. CFO Jason Presley emailed me in regards to this letter, but his response did not express a reasonable interest in addressing and correcting these problems which affect our students' quality of experience, but rather, was harsh, defensive and critical, which is, unfortunately, his management style.

Beyond my own situation, however, I think you should be made aware of the fact that the management of GSE in general is very problematic. In the recent Penn staff survey, the GSE management team only received a 40% approval rating, which says a lot. A very serious matter involving this survey is that we were encouraged by both Penn and the survey consulting firm to submit our honest comments about our workplace, and we were assured that these would remain absolutely confidential, that no one at Penn would see them, that they would only be used in the preparation of a synthesis report presented to the University. However, at the GSE meeting at which the survey results were reviewed, CFO Presley stated that he'd read our comments. Staff members were shocked by this, some were extremely upset and alarmed by this breach of confidentiality, even to the point of tears, and how it could potentially affect their jobs.

My point is that this is the management style of the current GSE administration – it does not address serious employee concerns that affect students' educational experience; it disrespects its staff and students alike (Presley has made comments in managers' meetings in regards to student enrollment yield such as "Who cares about quality?"). It fosters the current GSE culture of employee low morale and fear.

The purpose of this letter goes beyond the legal. It is to make you aware of serious problems within one of Penn's Schools that seem to be kept hidden within its walls, and which need to be brought to the University administration's attention. For when this litigation is over and I'm gone, a culture of disrespect, fear and deception will continue to exist at GSE, and that is very unfortunate for staff and students alike, and unbefitting a university of this reputation.

Sincerely,

Janet White

Janet White

Coordinator

Education Policy Division

Graduate School of Education

University of Pennsylvania

3700 Walnut Street

Philadelphia, PA 19104-6216

Phone: 215-898-0597

---

**2 attachments**

 **ltr_Porter_040214.pdf**
19K

**Penn Staff Survey.pdf**
312K

Exhibit F

 **The Daily Pennsylvanian**

# Penn employee sues over alleged retaliation for medical leave

### The federal lawsuit claims Penn violated the Family Medical Leave Act

By Sarah Smith · February 17, 2014, 10:02 pm   · Updated February 18, 2014, 9:52 am

In the spring of 2013, Janet White felt that she couldn't stay at work anymore.

White, who worked as a program manager at the Graduate School of Education, had managed her bipolar II disorder for the past six years without a major episode. In late 2012, the condition flared up again, sending her to cry in the bathroom for 30 minutes at a time at work and experience severe mood swings. She decided to take an eight-week leave of absence from her job in May 2013.

White claims that upon returning to work, she got a negative performance review and was subsequently demoted because of her leave. She filed suit against the University on Dec. 2, 2013 in United States District Court in Camden, N.J., accusing the University of violating the Family Medical Leave Act. The federal law entitles eligible employees to take unpaid leave without punishment for specific family and medical reasons, including serious mental conditions.

"I want to draw attention to the fact that not only has Penn failed to seriously and meaningfully address the mental health concerns of its student body, this failure has extended to University employees as well," White, a 1995 College graduate, wrote in a Feb. 11 letter to The Daily Pennsylvanian.

The University declined to comment, as the lawsuit is ongoing.

"We'd like to do anything we can — in any way we can — to advance the effort to see mental health treated equally with physical health," said White's New Jersey-based attorney, Michelle Douglass.

White began as program manager after a year at GSE and about 20 years in various Penn offices. As her mental condition worsened, she spoke to a staff member in the University's Office of the Ombudsman and a University benefits specialist, both of whom assured her that she should take a leave of absence, according to the suit.

After meeting with a psychologist and support groups, White returned to work in the beginning of July with notes from her doctor, the complaint reads. Two weeks after she got back, she received her performance evaluation.

"Absences from work are … within any employee's rights," reads a copy of the evaluation submitted as an exhibit with the suit. "While legitimate, Coordinator absences, of course, exacerbate these workload difficulties. This was the case at the end of the academic year."

Her supervisor told White that her position would be discontinued and that she would become an administrative assistant, the complaint reads, which White considered a demotion from her previous position. She tried to work out the dispute through the University ombudsman, the suit claims, but was unable to come to a resolution about her position and about removing a review that she felt would harm her ability to get new jobs.

"Sometimes, the only way to get somebody's attention is to file a lawsuit," Douglass said of Penn. The best-case scenario she envisions for White is a new assignment within the University or an entirely new position — without the recent performance evaluation in her file.

The lawsuit seeks unspecified damages "to vindicate [White's] rights under the laws."

As White watched the debates about the state of mental health and resources on campus unfold in the wake of this semester's suicides, she wanted to share her experience.

"I hope that whatever the outcome," she wrote in the letter, "my story will help to further improve the way mental illness is viewed and treated at Penn."

**WHITE000185**

Last updated February 18, 2014, 9:52 am

**Filed under:**Administration , News
**Permanent link:** http://www.thedp.com/r/727632c4

*The DP encourages productive discussion but is not liable for the content of the comments posted below and may remove them at its sole discretion.*

**3 Comments**    The Daily Pennsylvanian                     Login ▾

Sort by Best ▾                              Share    Favorite★

 ┌─────────────────────────────────────┐
                    │ Join the discussion…               │
                    └─────────────────────────────────────┘

 **GSE2015** · 14 days ago
I've worked with her at GSE, and she came out in person on Christmas eve to help me through paperwork. Its anecdotal, but she cared very deeply about getting my issues at GSE resolved. Penn has been mum on mental health and only retaliating to incidents as they arrive, instead of being a proactive leader - especially with its rich history of psychology and psychiatry. It would be great to hear what some of the faculty in those areas have to say about this and many of the other issues Penn has regarding policy and initiative towards mental well being.

12 ∧ │ ∨ • Reply • Share ›

 **Nik Lygkonis** · 14 days ago
All they need is a transparent talent management process, which from what I read its currently missing. I am the co-founder **PeopleGoal.com** and we have tackled similar problems in other organisations. Happy to help in any way.

∧ │ ∨ • Reply • Share ›

 **F Penn** · 14 days ago
Good! It's about time that some of the power-hungry, narcissistic people of this University be held accountable for violating medical leave laws. I hope she wins a TON of punitive damage money.

∧ │ ∨ • Reply • Share ›

**WHITE000186**

# Exhibit G

# UNIVERSITY OF PENNSYLVANIA
## HUMAN RESOURCES/COMPENSATION
## POSITION INFORMATION QUESTIONNAIRE SHORT FORM

☐  Check if new position is being created   Date:  6/29/12

Job Title: Manager C   Employee Name:  Janet White

Job Class Code/Grade:  27   Penn ID:  10011316

School/Center:  Graduate School of Education   Supervisor's Name:  Richard Ingersoll/Jason Presley

Department:  Education Policy   Supervisor's Title:  Professor/Executive Director of Administration

**POSITION SUMMARY:** In a few sentences, *briefly* describe the primary function and purpose of the position.

The Manager will work collaboratively and with the guidance of faculty in the Education Policy program and the GSE Executive Director of Administration. The appointee will manage all non-academic functions within the program. In collaboration with faculty and the GSE Admissions Office, the Manager will manage recruitment and admissions to the Education Policy program Ph.D. and M.S.Ed. courses of study; he or she will be responsible for handling inquiries from applicants and admitted students prior to their matriculation. The Manager will coordinate student orientation with the Student Affairs Office. Management of financial aid allocation and small operating budget are also among the duties. A major responsibility is to assure that required and elective courses are appropriately scheduled and staffed. Collaboration with colleagues in similar positions for other programs, helping to improve GSE-wide work processes, is expected. Another responsibility is coordination and supervision of an administrative assistant.

**PRINCIPAL POSITION REPONSIBILITIES/DUTIES:** List up to ten major tasks starting with the most important for which the position is responsible.  Include the estimated percentage of time spent on performing the task, with no task more than 50%.  Place an asterisk (*) in the Essential Function column to designate an essential function of the job.  At least 50% of the job must be designated "Essential".

| | RESPONSIBILITIES/DUTIES | Estimated % of Time | Essential Function |
|---|---|---|---|
| 1 | Admissions - Coordinating with Admissions Office, speak with inquiries via e-mail, phone, walk-ins, open houses, help them determine their programmatic needs; answer questions about processes. Process approximately 85 applications for the Ph.D. program and 100 for master's program. This involves e-mail/phone/interview conversations and processing the actual decisions, financial aid, assistantship assignments, etc. Attend weekly admissions meetings. | | |
| 2 | Manage financial aid allocations and student assignments - Work with division chair to assign financial aid and identify research assistant placements for funded doctoral students. | | |
| 3 | Manage division operating budget - Review budget reports each month, making sure all charges are accurate; keep track of specific faculty expenditures; complete yearly request for enrollment, admission, faculty teaching, instructor hires and operational budget information. Monitor copy and office supply usages. | | |
| 4 | Division course management and course rostering - Working with Chair and faculty, draw up yearly plan for teaching, making sure that required courses are offered at appropriate times. Monitor enrollment and enter permits as required. Assist instructors as needed. | | |
| 5 | Facilitate amd support divisional operations - Strategically manage divisional activities; plan for monthly faculty meetings with Chair; draw up agenda, gather supporting documents, write/distribute minutes. For exams, collect readings, schedule exam dates, process grading, produce ballots/letters as required. | | |
| 6 | Student management and assistance - serve as primary contact for all divisional students and manage student progress through program. Greet new students. Set up student-student mentoring pairs. Help students work through problems or issues; explain policies and procedures, etc. Maintain records and monitor student progress through program. Serve as primary contact with Student Records Office. | | |
| 7 | Direct supervision - Supervise one administrative assistant | | |
| 8 | Other duties and responsibilities as assigned | | |
| | | 100% | |

Identify any of the above listed tasks that were added in the last year by listing the related numbers:

**JOB EVALUATION FACTORS:** Listed below are job evaluation factors. Check the single best answer that applies. (Refer to PIQ guidelines for definitions.)

| Position Evaluation Factor | Response | | Key Words |
|---|---|---|---|
| **Q1** | [ ] | 1 | H.S. Diploma or GED preferred |
| **Formal Education** | [ ] | 2 | H.S. Diploma or GED required |
| (Minimum education req.) | [ ] | 3 | Vocational or Technical School required |
| | [ ] | 4 | Associate's Degree or Two Year College equivalent required |
| | [ ] | 5 | Bachelor's Degree required;  Major (optional) _____ |
| | [ ] | 6 | Master's Degree required;  Major (optional) _____ |
| | [ 7 | | M.D., Ph.D., Law Degree or equivalent doctoral degree required |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Q2** | [ ] | 1 | 0 to 1 year | [ ] | 5 | 5 to 7 years |
| **Minimum Experience** | [ ] | 2 | 1 to 2 years | [ ] | 6 | 7 to 10 years |
| (Minimum experience req.) | [ ] | 3 | 2 to 3 years | [ ] | 7 | Over 10 years |
| | [ ] | 4 | 3 to 5 years | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Q3a** | [ ] | 1 | Daily | [ ] | 5 | Four to Twelve Months |
| **Planning Scope** | [ ] | 2 | Current Week | [ ] | 6 | One to Three Years |
| (Highest level of planning req.) | [ ] | 3 | One to Four Weeks | [ ] | 7 | Three Years or More |
| | [ ] | 4 | One to Three Months | | | |

| | | | |
|---|---|---|---|
| **Q3b** | [ ] | 1 | Individual (position only) |
| **Planning Level** | [ ] | 2 | Unit or equiv. (<15  faculty & staff) |
| (Level of primary scope of planning) | [ ] | 3 | Section or equiv. (> 15 faculty & staff) |
| | [ ] | 4 | Department or equiv. (> 15 faculty & staff) |
| | [ ] | 5 | School/Center |
| | [ ] | 6 | University-wide |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Q4a** | [ ] | 1 | None | [ ] | 4 | Recommending |
| **Impact on Operating Budget** | [ ] | 2 | Incidental | [ ] | 5 | Controlling |
| | [ ] | 3 | Supportive | [ ] | 6 | Delegating |
| | | Approximate Size of Budget  $ _50000_____ | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Q4b** | [ ] | 1 | None | [ ] | 4 | Recommending |
| **Impact on Grant Funds** | [ ] | 2 | Incidental | [ ] | 5 | Controlling |
| | [ ] 3 | | Supportive | [ ] | 6 | Delegating |
| | | Approximate Size of Budget  $__TBD_____ | | | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Q4c** | [ ] | 1 | None | [ ] | 4 | Contributory |
| **Impact on Revenue Generating** | [ ] | 2 | Indirect | [ ] | 5 | Major impact |
| | [ ] | 3 | Supportive | [ ] | 6 | Directing |
| | | Approximate Size of Budget  $__TBD_____ | | | | |

| | | | |
|---|---|---|---|
| **Q5** | [ ] | 1 | Standardized: duties are few and repetitive |
| **Complexity** | [ ] | 2 | Routine: routine tasks, processes, or operations |
| | [ ] | 3 | Basic: moderately complex procedures and tasks |
| | [ ] | 4 | Varied: complex and varied work |
| | [ ] | 5 | Analytic: non-standardized and widely varied work |
| | [ ] | 6 | Highly Complex: broad in scope covering one or more complicated areas |
| | [ ] | 7 | Multifaceted: broad in scope covering the entire University's operations |

| | | | |
|---|---|---|---|
| **Q6** | [ ] | 1 | Standardized: little independent judgment required |
| **Decision Making** | [ ] | 2 | Routine: limited opportunity for independent judgment |
| (Level of direction & | [ ] | 3 | Basic: provided on an as needed basis; some independent judgment necessary supervision) |
| | [ ] | 4 | Varied: establish general objectives relative to project; independent judgment required |
| | [ ] | 5 | Analytic: establish and review broad objectives relative to duties/responsibilities |
| | [ ] | 6 | Highly Complex: review established objectives/recommend department/school objectives |
| | [ ] | 7 | Multifaceted: review and approve major recommendations; establish procedures |
| **Q7** | [ ] | 1 | Problems solved by reporting them to a supervisor |

3

**Problem Solving**
(Typical level encountered over extensive period of time)

[ ] 2   Problems solved by talking with a supervisor
[ ] 3   Solutions found by selecting from specific choices defined in standard work policies
[ ] 4   Solutions found by using methods chosen before in similar situations
[ ] 5   Problem solving involves identification and analysis of diverse problems
[ ] 6   Problems are complex, varied and only mildly related to those seen before
[ ] 7   Problem solving requires understanding and evaluation of impact upon the University

**Q8a**
**Internal Contacts**

[ ] 1   Little or no contact
[ ] 2   Regular contact within department & periodic contact with other departments
[ ] 3   Regular contact within department & with other departments; supplying information
[ ] 4   Regular contact to carry out programs; occasionally with officials at higher levels
[ ] 5   Regular contact to carry out programs; continuing contacts with officials at higher levels
[ ] 6   Regular contact with internal persons of importance and influence
[ ] 7   Continuing contacts involving difficult formal negotiations

**Q8b**
**External Contacts**

[ ] 1   External communication with others is minimal
[ ] 2   Occasional contact with outside agencies & general public supplying information
[ ] 3   Regular contact with outside agencies & general public supplying/seeking information
[ ] 4   Regular external contacts to explain specialized matters, occasionally to enforce policies
[ ] 5   Regular external contacts, with continuing personal contact to enforce policies
[ ] 6   Regular contact with external persons of importance and influence
[ ] 7   Continuing external contacts involving difficult formal negotiations

**Q9a**
**Supervisory Responsibility**

[ ] 1   No responsibility or authority for direction of others
[ ] 2   Authority limited to direction of student &/or temporary workers
[ ] 3   Orient/train others; may act in a lead capacity
[ ] 4   Provide limited supervision for one or more functions within a department (functional)
[ ] 5   Make recommendations re: HR issues; plan/assign/evaluate work of staff (bonafide)
[ ] 6   Supervise multiple functions, with full responsibility for effective operation & results
[ ] 7   Overall responsibility to provide direction and guidance for Penn

_____1_____   Number of Direct Reports          _____   Number of Indirect Reports

**Q10a**
**Job-Related Knowledge**
(Knowledge & skill required to expertly perform job

[ ] 1   Basic Skills                    [ ] 5   Entry Professional Skills
[ ] 2   Intermediate Skills             [ ] 6   Advanced Professional Skills

[ ] 3   Advanced Skills                 [ ] 7   Multiple Professional Skills/external
[ ] 4   Formal Technical Skills

**Q11**
**Innovation/Creativity**
(Degree job requires developing/ improving procedures, policies systems, etc.)

[ ] 1   Opportunities for innovations are rare
[ ] 2   Improved methods affect the immediate department
[ ] 3   Improved methods affect delivery of service to selected customer or students
[ ] 4   Results impact several work groups, a large project or an extended customer base
[ ] 5   Results generally affect a school/center within the University
[ ] 6   Results generally affect several schools/centers
[ ] 7   Results generally affect the University as a whole; impact competitive position

**POSTING INFORMATION:** *(TO BE COMPLETED ONLY IF POSITION IS TO BE POSTED)*

Write summary of position for posting purposes.

**DUTIES:** *(Description should be brief and only include principle duties.)*

The Manager will work collaboratively and with the guidance of faculty in the Education Policy program and the GSE Executive Director of Administration. The appointee will manage all non-academic functions within the program. In collaboration with faculty and the GSE Admissions Office, the Manager will manage recruitment and admissions to the Education Policy program Ph.D. and M.S.Ed. courses of study; he or she will be responsible for handling inquiries from applicants and admitted students prior to their matriculation. The Manager will coordinate student orientation with the Student Affairs Office. Management of financial aid allocation and small operating budget are also among the duties. A major responsibility is to assure that required and elective courses are appropriately scheduled and staffed. Collaboration with colleagues in similar positions for other programs, helping to improve GSE-wide work processes, is expected. Another responsibility is coordination and supervision of an administrative assistant.

**QUALIFICATIONS:** *(Qualifications should clearly indicate those that are required and those that are preferred.)*

College-level experience in a relevant field is desirable; evidence of organizational ability and attention to detail from prior administrative work is desirable. It is expected that the appointee will have the ability to prioritize projects in his or her ambit, write clearly, participate in recruitment activities, and support faculty with discretion and judgment. The ability to maintain positive working relationships is critical. Expertise working with Excel and databases and a willingness to learn and develop new skills is highly desired.

Supervisor's signature _____     Date: _____

Revised  04/08

# Exhibit H

WHITE,JANET A 007778244 (3/12/1965)  Visit Dt: 4/22/14

# Penn Behavioral Health

## Billable Activity

WHITE,JANET A (007778244)        03/12/1965  F
| | | Encounter | Authorizing | |
| Date | Time | Provider | Provider | Department |
| 4/22/14 | 1:00 PM | NEWMAN, CORY FRA* | NEWMAN, CORY FRA* | PBHCCT |

Referring Provider: SELF, REFERRAL [39946]

  Visit Number: not defined    Visit Type: Return Patient Visit

---

Family Account:

Level of Service:  PSYCHOTHERAPY PATIENT &/ FAMILY 60 MINUTES [90837]

Primary Diagnosis: 296.89     Depressed bipolar II disorder

---

Procedures

Check-out comment: 20.00 Check
Total Fee: $ _____ 150
Co-Pay Amt Due: $ _____ 20
Amt Paid:$ _____ 20
Cash/Credit/Check# _____
Employee: _____

Co-Pay Information
Co-pay paid by patient: --
Other Amount: --
Payment Type: --

---

Disposition:
  Return in 8 days (on 4/30/2014) for appt. @ 2:00 PM.
Visit Followup:None
Visit Instructions:None

---

Center for Cognitive Therapy
3535 Market Street, 2nd Floor
Philadelphia, PA 19104
Phone: 215-898-4100
Tax ID: 23-2743561

Cory F. Newman, Ph.D.
PA License #: PS-005406-L
NPI #: 1588696892

WHITE,JANET A 007778244 (3/12/1965)  Visit Dt: 4/22/14